Department of Justice          Ministère de la Justice
Canada                        Canada

International Assistance Group/Service d'entraide internationale                    Tel./Tél.: 613-948-3003
284 rue Wellington Street                                                          Fax/Téléc.: 613-957-8412
Ottawa, Ontario K1A 0H8                                              Email: janet.henchey@justice.gc.ca

March 30, 2015

**BY EMAIL**

Lisa Roberts, Acting Associate Director
Office of International Affairs
U.S. Department of Justice
1301 New York Ave., NW Suite 800
Washington, DC 20005

Dear Ms. Roberts:

## Re:    The Extradition of Jason Leonard Boyachek from Canada to the United States of America for the Purpose of Prosecution

This letter is provided by the International Assistance Group at the Department of Justice Canada at the request of the Office of International Affairs at the U.S. Department of Justice to summarize the protracted extradition proceedings which culminated in the surrender of Jason Leonard Boyachek from Canada to the United States for the purpose of prosecution on narcotic-related offences.

The U.S. requested Mr. Boyachek's extradition in August 2010. A warrant for his arrest issued on January 13, 2011. Canadian law enforcement were initially unable to locate Mr. Boyachek until September 11, 2011 when he was arrested on the extradition warrant. He was granted bail on September 27, 2011 following a contested bail hearing.

Mr. Boyachek vigorously contested his extradition.  The extradition hearing took place over two years from October 2011 to September 4, 2013.

Between October 2013 and February 2014, Mr. Boyachek made extensive submissions to the Minister of Justice of Canada further resisting his surrender. These submissions included the claim that U.S. prosecuting authorities had engaged in conduct amounting to an abuse of process justifying a stay of the extradition proceedings. On February 24, 2014, the Minister rejected these submissions and Mr. Boyachek was ordered surrendered to the United States to face prosecution.

Mr. Boyachek appealed his committal by the extradition judge and applied for judicial review of the Minister's decision ordering his surrender. The appeal and judicial review were heard on September 9, 2014. On November 14, 2014, the British Columbia Court of Appeal, in lengthy written reasons, dismissed the committal appeal and application for judicial review. The reasons of the Court of Appeal, which are attached hereto, trace the protracted and complicated history of the extradition proceedings.



Canadä

**GOVERNMENT EXHIBIT**
**1**

Detention hearing

On November 14, 2014, Mr. Boyachek applied to the Supreme Court of Canada for leave to appeal from the decision of the Court of Appeal. He ultimately abandoned that application on March 5, 2015.

Mr. Boyachek was surrendered to the U.S. authorities on March 26, 2015, more than 3 and-a-half years after his arrest on the extradition warrant.

As the foregoing illustrates, the extradition proceedings involving Mr. Boyachek were both time and labour-intensive for Canadian and American authorities. If Mr. Boyachek is granted bail in the United States pending his trial on the American charges and returns to Canada, the only way to return him to the United States to stand trial would be for the U.S. authorities to make a second request for his extradition. The second extradition request would have to proceed through the committal and surrender stages and any related appeal proceedings in the same manner as the first extradition request. This process is likely to take several years and would require substantial resources to complete.

If you have any questions or require any additional information, please do not hesitate to contact me.

Yours truly,

Janet Henchey
Director General and Senior General Counsel
International Assistance Group
Litigation Branch, Criminal Law Division

JH/jj

Att.

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:       *U.S.A. v. Boyachek,*
                2014 BCCA 437

                                              Date: 20141114
                                              Docket: CA41165

Between:

## Attorney General of Canada
## On behalf of the United States of America

                                              Respondent
                                              (Requesting State)

And

### Jason Boyachek

                                              Appellant
                                              (Person Sought)

- and -

Between

### Jason Boyachek

                                              Applicant

And

### Minister of Justice

                                              Respondent

Before:       The Honourable Mr. Justice Donald
              The Honourable Madam Justice Bennett
              The Honourable Mr. Justice Goepel

              On appeal from: Supreme Court of British Columbia, September 4, 2013,
              (*U.S.A. v. Boyachek*, 2013 BCSC 1636, Vancouver Docket No. 25649).

On judicial review from: An order of surrender issued by Canada (Minister of Justice), dated February
              24, 2014, (*Boyachek v. Canada (Minister of Justice)*)

Counsel for the Appellant:                              G. Botting
                                                        A.J. Gray

Counsel for the Respondent:                             D.J. Strachan
                                                        J. Reid

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 3 of 28

Place and Date of Hearing:

Vancouver, British Columbia
September 9, 2014

Place and Date of Judgment:

Vancouver, British Columbia
November 14, 2014

**Written Reasons by:**
The Honourable Madam Justice Bennett

**Concurred in by:**
The Honourable Mr. Justice Donald
The Honourable Mr. Justice Goepel

*Summary:*

*The appellant is sought for extradition by the United States on charges related to marihuana
trafficking. The only witness relied on by the requesting state purportedly recanted his evidence
against the appellant, and counsel for the appellant sought to introduce this recantation as evidence
before the extradition judge. The extradition judge first admitted the evidence, but later excluded the
evidence when the witness withdrew the alleged recantation. The extradition judge concluded that
concerns regarding the witness' testimony went to credibility rather than reliability, and ordered the
appellant's committal. The Minister of Justice subsequently ordered the appellant's surrender.*

*In this proceeding, the appellant appeals the extradition judge's committal order and applies for
judicial review of the Minister's surrender order.*

*Held: appeal and application for judicial review both dismissed. The extradition judge did not err in
her exclusion of the evidence tendered by the appellant, or in finding that there was admissible
evidence justifying committal, or in finding that the requesting state did not engage in an abuse of
process. Furthermore, there is no basis for concluding that the Minister's decision to order surrender
was unreasonable. The Minister did not misapprehend the facts of the case in a manner that justified
relief, and did not err by finding that the requesting state did not engage in an abuse of process.*

**Reasons for Judgment of the Honourable Madam Justice Bennett:**

[1]     Jason Boyachek is wanted by the United States of America ("the requesting state") for his
alleged involvement in a large marihuana distribution scheme. He was committed for extradition on
September 4, 2013. The Minister of Justice ordered his extradition on February 24, 2014.
Mr. Boyachek appeals the decision of the extradition judge and seeks judicial review of the Minister's
decision.

[2]     On appeal, Mr. Boyachek argues that the main witness against him, David Downing, recanted
his evidence which significantly affected his reliability as a witness. He also argues that the Assistant
United States Attorney ("AUSA"), Patrick Reinert, inserted himself into the extradition proceedings,
and his conduct amounted to an abuse of process.

[3]    On judicial review, Mr. Boyachek argues, amongst other things, that the Minister erred by failing to observe the principles of natural justice, misapprehended the evidence and failed to give effect to the abuse of process alleged as a result of Mr. Reinert's conduct.

[4]    I would dismiss the appeal against committal and the application for judicial review.

## Background

[5]    The proceedings during the committal phase of the extradition were complicated. I have set out the background in considerable detail as the history is essential to understanding the factual matrix of the arguments presented.

[6]    On December 22, 2010, a delegate of the Minister of Justice issued an Authority to Proceed ("ATP"), pursuant to section 15 of the *Extradition Act*, S.C. 1999, c. 18. This permitted the Attorney General of Canada to proceed on behalf of the requesting state before the Supreme Court of British Columbia to seek Mr. Boychek's extradition in relation to the corresponding Canadian offences of:

a)     Conspiracy to traffic in Schedule II substance, contrary to section 5 of the *Controlled Drugs and Substances Act*, S.C. 1996, c.19 [*CDSA*] and section 465 of the *Criminal Code*, R.S.C. 1985, c. C-46 [*Code*]; and

b)     Conspiracy to possess property obtained by crime, contrary to sections 354 and 465 of the *Code*.

[7]    Mr. Reinert certified a Record of the Case for Prosecution (ROC) on July 22, 2010. The ROC contained a summary of the evidence it intended to call at trial. Of importance is the following summary of David Downing's evidence:

David Anthony Downing (hereafter "Downing") has pled guilty to drug and money laundering offenses and is cooperating with federal officials. Downing will testify that in March/April 2005, he moved to Chicago and began assisting BOYACHEK in the marijuana smuggling business to repay a debt that he owed to BOYACHEK. The marijuana was smuggled into the United States from Canada and transhipped to Chicago. Downing will testify that he and BOYACHEK distributed marijuana in the Chicago area as well as redistributed the marijuana to other locations in the United States including Boston and New York. Downing and BOYACHEK maintained the records of the amounts of marijuana that was distributed and money that was made. In fact, Downing will admit that the records were in his handwriting and detail his, BOYACHEK's, and others, involvement in the drug activity. Downing will testify that the photograph attached as EXHIBIT A is a photograph of JASON LEONARD BOYACHEK.

Downing will testify that in 2005, he began working for BOYACHEK by counting money from the sale of drugs. In 2006, when Downing became more involved in the marijuana distribution, Downing and BOYACHEK began to split the money. BOYACHEK received $200 per pound and Downing made $50-$75 per pound of marijuana distributed. BOYACHEK stopped residing in Chicago in approximately December 2006 or January 2007. Downing would testify that BOYACHEK returned to Canada to deal with quality control problems with the marijuana being shipped. When BOYACHEK left Chicago, he directed Downing to

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 5 of 28

assume responsibility for the entire Chicago distribution hub. After BOYACHEK left for Canada, Downing made $100 per pound of marijuana shipped and BOYACHEK made $125-150 per pound.

While Downing worked in Chicago for BOYACHEK, Downing will testify that he actually worked with three different "teams" of individuals shipping marijuana from Canada to the distribution hub operated by BOYACHEK and Downing in Chicago. Each of these teams color-coded their marijuana where each color represented a certain final destination for the marijuana. Once the marijuana was in Chicago, and based on the color, some was distributed locally and some was shipped to New York and Boston. It was Downing's and BOYACHEK's responsibility to organize where the marijuana was to be sent. Downing and BOYACHEK also maintained contact with the teams in Canada via Blackberry. Each of these teams had their own people responsible for drug delivery and pick up of currency.

Downing will testify that while BOYACHEK was still in Chicago, many of these teams also transported money from the sale of drugs (hereafter "drug proceeds") from the customers to BOYACHEK. Routinely, drivers came to Chicago to pick up the drug proceeds from BOYACHEK. At the direction of the leaders in Canada, these individuals picked up the money and transported it to California where the drug proceeds were given to others to be smuggled into Canada or for other criminal activities. Downing will testify that Juliana Steemberg and Jana Wiltsey were two of the individuals who transported marijuana and money for the organization. Downing will also testify Jeffery Kopp was one of the individuals who brought marijuana to him in Chicago.

Downing will also testify that he also knew of prior drug currency seizures from BOYACHEK and others in the organization, specifically the 2006 seizure of $738,650 in United States Currency stored in BOYACHEK's locker.

[8]     Also summarized in the ROC was the anticipated evidence of Juliana Steemberg. Ultimately, the requesting state did not rely on Ms. Steemberg's anticipated evidence.

[9]     The ROC also outlined other anticipated testimony, but it was conceded that none of it directly implicated Mr. Boyachek.

### Application to Adduce Evidence

[10]     The extradition committal hearing was set for December 3, 2012, before Madam Justice Griffin. Prior to the hearing, on November 15, 2012, Mr. Boyachek filed an application to adduce evidence from Mr. Downing and Ms. Steemberg. The evidence to be adduced was outlined in two affidavits: one sworn by Mr. Downing on November 7, 2012, and one sworn by Ms. Steemberg on November 15, 2012. The affidavits purported to recant Mr. Downing's and Ms. Steemberg's earlier evidence.

[11]     In answer to the November 2012 affidavits, counsel for the requesting state filed a Supplemental ROC (SROC) dated November 20, 2012. The relevant parts of the SROC are as follows:

3.     David Downing and Juliana Steemberg have completed their prison sentences and are currently in Canada. According to Downing's U.S. counsel, Downing is willing to voluntarily return to the United States to testify in this matter.

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 6 of 28

...

5.    In the event Downing returns to testify and changes his version of events, he can be cross-examined on his prior law enforcement interviews and sworn testimony before the Grand Jury, which remains available for trial.

...

7.    In the event neither Downing nor Steernberg voluntarily return to the United States to testify against the defendant at trial, there is still sufficient evidence to proceed to trial based upon the 2003 and 2006 currency seizures from the defendant; the evidence seized in the 2007 search of the Kingsbury residence in Chicago, which included indicia of occupancy by the defendant and a drug ledger; and the interdiction of other couriers, including Steernberg. Law enforcement witnesses can also link Steernberg to the Chicago distribution hub through the contents of her telephone seized during the stop and her controlled contact with Downing. The contents of her telephone include 197 pages of email messages from and to Steernberg and a variety of different individual email accounts. These messages discuss her activities in the conspiracy (including her link to the Kingsbury addresses (described as the new "office") and her subsequent work with law enforcement to conduct a controlled transaction in Boston. These messages are from April 21, 2007, through May 21, 2007.

[12]    Mr. Boyachek admitted he was the person sought, thus identity was not in issue.

[13]    At the committal hearing, Mr. Boyachek tendered the November 2012 affidavit of Mr. Downing. I reproduce some of the paragraphs from this affidavit to demonstrate the sense of his recantation:

I, David Anthony Downing, of West Vancouver, British Columbia - husband and father and until recently an inmate of the United States Bureau of Prisons, having pled guilty to drug and money laundering offences in order to secure a much lighter sentence than I would have received had I gone to trial, MAKE OATH AND SAY:

1.    I was charged with drug and money laundering offences arising from what appears to be the same conduct and incidents of which Jason Boyachek now stands accused, and as such I have knowledge of the matters hereinafter deposed except where they are stated to have been received on information and belief, and where so stated I verily believe them to be true.

2.    I have gone over Mr. Boyachek's Record of the Case for Prosecution - specifically the summary of the evidence that the United States prosecution is said to be based on - and find much of it to be fabrication or wishful thinking on the part of the drafters.

3.    It appears that they have taken the accusations against me, made an organization chart for the marijuana supply service of which I admittedly was a part, and arbitrarily inserted "BOYACHEK" at the top as if he were my boss. Jason Boyachek has at no time been my boss, nor has the distribution service I coordinated in Chicago ever been headed by Jason Boyachek.

4.    The smuggling of marijuana into the United States from Canada was controlled by different people altogether. To this day I do not know their identities, but I do know it was not Jason Boyachek.

5.    I do not remember ever saying to the ICE officers interviewing me that Jason Boyachek was my boss, or that I worked under him or "for" him, and I certainly did not tell them that my marijuana distribution service was "Boyachek's drug operation" or

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 7 of 28

"Boyachek's marijuana distribution network" or "Boyachek's organization." Such a characterization is completely untrue. The "drug operation" and "marijuana distribution network" implies a conspiracy which did not exist. The various people who supplied product to me did not include Jason Boyachek: they were people whom I have only met via Blackberry, and I specifically told the ICE agents this.

...

8.    I did not suggest that he was big-time drug organizer as seems to be alleged. To the extent that they have suggested that I said otherwise, they are lying. They have put words in my mouth.

...

10.    I emphatically did not "work for Boyachek," and Jason Boyachek did not "direct" me to do anything, let alone "assume responsibility for the entire distribution hub operated by Boyachek and Downing in Chicago." I do not know where they are getting this, but I did not say such a thing to anyone, nor would I have said it, because it is simply not true.

18.    The ROC is framed deceptively to try to make Jason Boyachek look guilty of involvement with Kopp. What is said about my involvement with Kopp is true - but again they have merely inserted the name of Jason Boyachek in a transparent attempt to implicate him, falsely, in the dealings between Kopp and me in 2007, long after Jason had left the U.S.

...

20.    I knew Jason as a friend and (for a few months) roommate and Kopp as a supplier on one occasion only - but months apart. The notion that Jason was part of any "conspiracy" involving Kopp, Dr. Brenaman and me is false and unsupportable. It simply is not true.

...

25.    My words and statements have been twisted by the author of the Record of the Case beyond recognition.

...

26.    I make this affidavit in order to set the "Record" straight, so that Jason Boyachek will not be sent back to the United States for alleged offences that he did not commit.

[14]    Similarly, the November 2012 affidavit of Juliana Steemberg also indicated the recanting of her anticipated testimony. As noted, the requesting state withdrew her evidence from the proceeding.

[15]    The purpose in tendering these affidavits, according to defence counsel, was to demonstrate that the evidence in the ROC was "so unreliable and tainted by rhetoric ...that it should be disregarded and ... Mr. Boyachek should be discharged".

[16]    Concerns were raised about the hearsay aspects of Mr. Downing's and Ms. Steemberg's affidavits, and as a result new affidavits were prepared in early January 2013. They appear in the Appeal Books, but were not marked as exhibits in the lower court, albeit they were filed in the registry. The extradition judge declined to review the affidavits on the basis that she was ruling on the general subject matter, rather than the precise form of the proposed evidence (*United States of*

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 8 of 28

*America v. Boyachek*, 2013 BCSC 44 at para. 112 ["evidence ruling"]). The new affidavits repeat much of what was in the above-noted affidavits.

[17]   The extradition judge gave her reasons on the application to adduce evidence on January 9, 2013. She admitted the affidavits of Mr. Downing and Ms. Steernberg (evidence ruling at para. 93). After considering the decision in *United States of America v. Ferras*, 2006 SCC 33, she found that the evidence was relevant to address their denial or recantation of the statements attributed to them in the ROC and their availability for trial in the United States (evidence ruling at para. 92).

## Reconsideration of the Evidence Ruling

[18]   After this ruling, the case took a startling turn. In June 2013, Mr. Downing, after consulting counsel, filed a new affidavit disavowing his earlier recantation. In addition, Mr. Downing's affidavit of June 2013 contained serious allegations about the conduct of Mr. Boyachek's counsel, Mr. Botting.

[19]   Below are some excerpts from the June 2013 affidavit of Mr. Downing:

...

4.   The basic process concerning both "affidavits" was the same. He [Mr. Botting] did the writing, and sent me a document. English was my worst subject prior to dropping out of high school in grade 11.

5.   I read over the document he [Mr. Botting] sent me. I would telephone him and speak about it. Usually these documents had many statements which were not true. I told him which of the statements which [*sic*] were not true. In our telephone calls he tried to persuade me to go along with his version of things, but I insisted that I wished to be truthful in whatever I said.

6.   He would send me another draft, which I would read, and the same process would repeat itself. He said things to me, especially concerning the second document, like, "this is the one that needs to be signed to make it work". I told him, when looking at more than one of the drafts, that some of the statements were not truthful. I understood that he was under some sort of time pressure.

7.   When we met to have me sign the documents, I asked him if he had made all of the changes we had previously discussed. He assured me that he had. I signed the document. I did not read it at that time. He gave me a copy of the second one, which I threw away.

8.   To the best of my recollection and belief he never asked me to swear that the contents of these documents were true. He did not say anything to me which I understood amounted to making the document a sworn document. I did not swear that it was the truth. I did not read the second document the day I signed it, and to the best of my recollection I did not read the first document immediately prior to signing it either.

9.   He knew that I had been represented by counsel in the United States, Todd Pugh, Esq. At no time did Mr. Botting advise me that I should seek independent legal advice, nor that I might face legal problems in Canada or the United States by executing an affidavit at his request. He never told me that he was not mindful of my interests, and as he is a lawyer I assumed he was and would be. He did not tell me that he was acting

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 9 of 28

exclusively in the interests of his client. I asked him if I should get counsel, and he said "I can do this for you".

10.   I was prosecuted in the United States for my actions in trafficking marijuana. I served a substantial term of imprisonment there, pursuant to a plea agreement and sentencing. Mr. Botting is well aware of my involvement in the United States, and my sentencing, because I have so told him so [*sic*]. He appeared to know already.

11.   I recall that the [*sic*] sent me copies of at least one of these documents sometime after I had signed them. I did not pay much attention to them when he sent them to me. Sometime earlier this year I took the time to review the document I had signed in January 2013. Some of the statements were not true. Some were misleading. Some things I had never seen before, and I did not say them to Mr. Botting. I became concerned that things which were claimed to have been said by me were going to be relied on in court, and that some of those statements were not true and they were not accurate. I sought advice from my counsel in the United States Mr. Pugh, and then from counsel in Canada, Mr. Donaldson.

12.   Only since executing these documents for him on 7 November 2012, and 3 January 2013, have I sought independent counsel. I am aware that the United States has suggested that they may say that these statements are in violation of my plea agreement. I had no intention at any time of violating any terms of my plea agreement. I understand that my counsel in the United States is concerned on my behalf about this prospect.

13.   Portions of those "affidavits" are untrue, not entirely accurate, and in isolation they may be misleading. Had I had the benefit of independent legal advice prior to signing them I would not have.

[20]   The requesting state also filed a Second Supplementary Record of the Case (SSROC). This document contained the actual plea agreement signed by Mr. Downing.

[21]   At the hearing before Madam Justice Griffin on June 24, 2013, the requesting state sought a reconsideration of Madam Justice Griffin's decision to allow Mr. Boyacheck to admit the evidence from Mr. Downing and Ms. Steernberg.

[22]   At that hearing, Mr. Botting advised the court that in his opinion it "would be highly unjust at this stage to force Mr. Boyachek to get new counsel". Despite this submission, Mr. Botting argued that the extradition judge should call Mr. Downing and Ms. Steernburg and permit him to cross-examine them on statements made to him. The extradition judge did not permit this cross-examination (*United States of America v. Boyachek*, 2013 BCSC 1560 at para. 65 ["reconsideration ruling"]).

[23]   The extradition judge changed her previous ruling, and concluded that the November 2012 affidavits were not admissible as evidence (reconsideration ruling at para. 82). She first set out the reasons for initially concluding that the evidence was admissible. She said, that at the evidence hearing, Mr. Botting had taken the position that "there was no conspiracy involving Mr. Boyacheck; the drug distribution activity was 'entirely' Downing's project" (reconsideration ruling at para. 20).

According to Mr. Botting, Mr. Boyacheck's involvement with Mr. Downing and Ms. Steernberg was only a social one (Para. 22).

[24]    She pointed out that Mr. Botting had asserted that Mr. Downing and Ms. Steernberg did not give statements to U.S. officials naming Mr. Boyachek. Furthermore, or alternatively, he had asserted that to any extent Mr. Downing and Ms. Steernberg did give statements to U.S. officials, they recanted those prior statements on the basis that they were coerced by the threat of a longer jail sentence (reconsideration ruling at paras. 20, 23).

[25]    To support his position, the extradition judge found that Mr. Botting "would take a statement made by Mr. Downing in the November 2012 Affidavit and extend it to be even more exculpatory of Mr. Boyachek than it was written. Thus, a statement from Mr. Downing that Mr. Boyachek did not 'control' the smuggling of marijuana into the United States from Canada, was expanded by Mr. Botting, in his submission, to mean that Mr. Boyachek was 'not involved' in such smuggling" (reconsideration ruling at para. 18).

[26]    The extradition judge noted that Mr. Botting had also made submissions regarding exculpatory evidence he expected Mr. Downing to give, which was not in the November 2012 affidavit. For example, Mr. Botting had claimed that Mr. Downing would testify that the approximately USD 738,000 seized by U.S. officials from Mr. Boyachek's locker was really Mr. Downing's cash, from a locker Mr. Boyachek and Mr. Downing shared (reconsideration ruling at para. 19).

[27]    Furthermore, Mr. Botting had submitted that the ROC was "gratuitously larded" with Mr. Boyachek's name wherever Mr. Downing's name was in it (reconsideration ruling at para. 20).

[28]    At the time of the application to adduce evidence, the extradition judge had found that the ROC did not include "any earlier statements or documents from Downing or Steernberg as supportive evidence, but instead described in a summary fashion using future tense as to what he or she 'will say' or 'will testify' or 'will admit'" (reconsideration ruling at para. 24). Consequently, she found that the November 2012 affidavits "raised the real possibility that the Requesting State did not have the evidence available that it had summarized" (reconsideration ruling at para. 24).

[29]    The extradition judge then examined the new June 2013 affidavit evidence and the SSROC, which attached the plea agreement Mr. Downing made with the U.S. Attorney's Office for the Northern District of Iowa.

[30]    The extradition judge found that the plea agreement "provides evidence that Downing has given evidence consistent with the summary of facts contained in it several times, in interviews with U.S. law enforcement officials, in court at his sentencing and guilty plea when he was represented by counsel, and in sworn testimony before a grand jury in 2008" (reconsideration ruling at para. 28). The

extradition judge also noted that Mr. Downing signed the plea agreement, and initialled each paragraph.

[31]    In his plea agreement, Mr. Downing explained that he met and became friends with Mr. Boyachek when he, Mr. Downing, was living in British Columbia and working as an indoor marijuana grower. In 2003, Mr. Downing borrowed money from Mr. Boyachek to support his new restaurant business, but the business failed about two years later. To repay his debt, Mr. Downing agreed to work for Mr. Boyachek in Chicago in the distribution of marijuana (reconsideration ruling at para. 30).

[32]    Mr. Downing further stated in his plea agreement that in 2005, he moved to Chicago to count currency and maintain records for the trafficking venture, which smuggled marihuana from Canada to Chicago and then further distributed it to other cities such as Boston and New York. Mr. Downing also confirmed that he maintained handwritten drug ledgers, which were seized by U.S. law enforcement (reconsideration ruling at paras. 29, 30).

[33]    Furthermore, Mr. Downing described details of his involvement in the trafficking scheme over the next few years, including (1) the manner in which he and Mr. Boyachek split drug proceeds (with Mr. Boyachek earning more), (2) Mr. Downing's increased role when Mr. Boyachek returned to Canada to deal with "quality control problems" with the marihuana, (3) that Mr. Downing and Mr. Boyachek would sort combined shipments of marihuana for redistribution, (4) a number of incidents in which the group had currency seized, including from Mr. Boyachek's luggage and locker, and (5) that Mr. Downing and Mr. Boyachek facilitated the transport of marihuana and currency (reconsideration ruling at paras. 30-34).

[34]    Regarding the availability of Mr. Downing's evidence, the SSROC provided evidence of Mr. Downing's availability to testify in the U.S. proceeding. The extradition judge made the following observations regarding Mr. Downing's availability (reconsideration ruling at paras. 36-38):

> First, it is a condition of Downing's plea agreement that he agrees to fully and completely cooperate with the United States Attorney's Office and other law enforcement agencies in the investigation of criminal activity within the Northern District of Iowa and elsewhere. That is detailed as including, but not being limited to, providing testimony before the federal grand jury and, if necessary, testimony before any court as a witness in any prosecutions growing out of this or any related investigation.
>
> Furthermore, Downing's plea agreement stated that he would provide complete and truthful information to government law enforcement officers and the federal grand jury conducting the investigation. It stated that:
>
>> The defendant will neither attempt to protect any person or entity through false information or omission, nor falsely implicate any person or entity.
>
> The plea agreement stated that Downing would at all times tell the truth and nothing but the truth.

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 12 of 28

[35]    In addition, both the SROC and SSROC indicated that according to Mr. Downing's U.S. counsel, Attorney Todd Pugh, Mr. Downing is willing to voluntarily return to the United States to testify in this matter (reconsideration ruling at paras. 39, 40). Furthermore, the SSROC stated that "prior to any trial in the United States, the United States will either make arrangements for Downing to testify in person or, if that is not possible, 'will seek to compel his deposition in Canada for use at trial in the United States pursuant to the treaty between the Government of the United States and the Government of Canada on Mutual Legal Assistance in Criminal Matters'" (reconsideration ruling at para. 43).

[36]    In the June 2013 affidavit, Mr. Downing stated that "portions of the affidavits he signed for Mr. Botting are untrue, not entirely accurate, and in isolation, they may be misleading. He states that if he had the benefit of independent legal advice, he would not have signed them. He does say that he is willing to testify under subpoena in this proceeding" (reconsideration ruling at para. 48).

[37]    In the reconsideration hearing, Mr. Botting tried to admit evidence of his email correspondence with Mr. Downing to illustrate that he gave Mr. Downing opportunities to change the November 2012 and January 2013 affidavits. The extradition judge gave no weight to the evidence given that in order to contradict Mr. Downing, Mr. Botting would need to become a witness and no longer act as counsel for Mr. Boyachek (reconsideration ruling at para. 50), something Mr. Botting was not prepared to do.

[38]    After assessing the SSROC and June 2013 affidavit evidence, the extradition judge concluded that she had interpreted the potential evidence of Mr. Downing too broadly, based in part on Mr. Botting's submissions. Consequently, she found that she could no longer give any weight to what Mr. Botting had advised the court would be the scope of Mr. Downing's evidence (reconsideration ruling at paras. 51-52).

[39]    The extradition judge concluded that the new material shed new light on the content and potential use of the November 2012 affidavit evidence. She made the following findings:

> [57]    I find that the facts regarding Downing's proposed evidence were fundamentally misapprehended at the time of the Evidence Application. The potential relevance of this evidence has changed entirely.
>
> [58]    Now that I have the Downing plea agreement in front of me as part of the Second Supplemental Record of the Case, I see that the November 2012 Affidavit, for the most part, when it came to specifics, did not dispute the facts he agreed to in his U.S. plea agreement. I can now clearly see that the excerpted portions of the November 2012 Affidavit, which were further emphasized by Mr. Botting in submissions, created a misleading impression that Downing's proposed evidence went further than it did.
>
> [59]    Mr. Botting's submissions during the Evidence Application suggested that Downing's evidence was that Mr. Boyachek was not involved in any drug trade at all. However, on close reading, there is no such specific denial in the November 2012 Affidavit, nor any denial of the

facts in his plea agreement stating that Mr. Boyachek was involved in the drug trade with him in 2005 and 2006. In short, even if Downing had not recently disavowed the November 2012 Affidavit, his evidence in it did not contradict the facts in his plea agreement which set out Mr. Boyachek's involvement in the drug trade with him in 2005 and 2006.

...

[62]    In short, I find that the content of Downing's possible evidence is materially different from that which was described to me at the Evidence Application. It would be a miscarriage of justice not to reconsider the Evidence Application in light of what is now known as, otherwise, it would sanction the court having been misled on the content of the proposed evidence.

[63]    In my Evidence Ruling, I held at para. 82:

> ... Here the proposed evidence to be called by the person sought to be extradited involves either the express denial by these witnesses that that(sic) they said all the things attributed to them in the Requesting State's Record of the Case or the recanting of their prior statements. If it goes as far as Mr. Boyachek's counsel argues it does, then it may mean that it destroys the only evidence in the Record of the Case that implicates Mr. Boyachek.

[64]    Mr. Botting no longer has any basis for submitting that Downing's proposed evidence will amount to a recanting or express denial of the bulk of the matters attributed to him by the Requesting State. I also note that Mr. Botting took no steps to have a subpoena issued to require Downing's attendance on the first day of this continued hearing.

[65]    Mr. Botting now submits that Downing should be called as a witness by the court so that Mr. Botting can cross-examine him including on his "prior inconsistent statements," namely, the affidavits which Mr. Botting himself drafted and presented to Downing and from which Downing now distances himself. Not only do I consider that this would be improper as the lawyer cannot be both advocate and witness, I consider that it would be irrelevant to the extradition hearing itself.

[66]    At present Mr. Botting obviously cannot assure the court that Downing has evidence to give that is broader than his November 2012 Affidavit. Downing's evidence is just the opposite. He affirms the plea agreement and disavows his earlier affidavits, as he says that portions of them are not accurate and, in isolation, may be misleading. He also says that he did not swear the evidence in them as true.

[67]    Mr. Botting can no longer say that the evidence of Downing will directly attack the very existence of the evidence relied on in the Record of the Case.

[68]    Like defence counsel in *United States of America v. Anderson*, 2007 ONCA 84, Mr. Boyachek's counsel cannot provide a summary of Downing's proposed evidence that could go beyond showing inconsistency. He is unable to propose that he is able to call evidence from Downing that could potentially justify concluding that his entire evidence is so totally unreliable that it completely undermines the Requesting State's case.

[69]    To put it another way, even if I was to consider Downing's November 2012 Affidavit as being the best attempt by counsel for Mr. Boyachek to capture his proposed evidence, it does not go so far as to indicate that the Record of the Case is manifestly unreliable. Once the November 2012 Affidavit is stripped of its hyperbole and opinions and is not supplemented by the expansive submissions of counsel, it does not go very far at all.

[70]    I conclude that, at best, if Downing is called as a witness on this extradition hearing, his credibility will be challenged by Mr. Boyachek.

[40]   Thus, the extradition judge reversed her earlier ruling and concluded that the November 2012 affidavits were not admissible in the committal hearing.

**Committal Ruling**

[41]   At the committal hearing, Mr. Boyachek argued that the requesting state threatened Mr. Downing with a longer sentence should he not testify (*United States of America v. Boyachek*, 2013 BCSC 1636 at para. 90 ["committal ruling"]). In the SSROC, Mr. Reinert stated:

> As a condition of Mr. Downing's sentencing and plea bargain, he agreed to cooperate in the prosecution of others, including Mr. Boyacheck, and further agreed he had a continuing obligation to continue to cooperate. A failure by Mr. Downing to abide by those conditions may constitute a breach of his plea and sentencing agreement, which may result in reopening his case.

[42]   The extradition judge took this comment by Mr. Reinert into account on the committal hearing, and concluded that it was "not an improper attempt to threaten a witness or influence this court, as submitted by counsel for Mr. Boyachek" (committal ruling at para. 91).

[43]   She did, however, make the following observations at paras. 51-54 of the committal ruling:

> I find that the certifying U.S. attorney, Mr. Reinert, was less careful than he should have been in the way in which he wrote the summary of evidence in the ROC. It is possible that Mr. Reinert does believe that all of the evidence of the Requesting State leads to the conclusion that the drug distribution network was indeed "Boyachek's organization". Regardless, Mr. Reinert was argumentative and careless in inserting Mr. Boyachek's name in places in the ROC when this was his conclusion rather than the actual evidence of witnesses. As worded, the ROC had the potential to mislead the court that Kopp or Steemberg would testify that the drug distribution operation they were involved in was Mr. Boyachek's.
>
> This makes it impossible to know when a statement in the ROC naming Mr. Boyachek is based on available evidence or is simply an argumentative conclusory statement of Mr. Reinert.
>
> It is a serious problem when the Requesting State puts forward a certified ROC which is misleading. It can justify rejecting the request for extradition, as in *Tarantino* and in *Toren*. It certainly undermines the presumption of reliability that normally applies to a certified record of the case.
>
> <u>I do not go so far as declaring the Requesting State to have engaged in an abuse of process here, nor was this conclusion urged upon me by counsel for Mr. Boyachek.</u>

> [Emphasis added.]

[44]   The extradition judge considered the evidence of Mr. Downing (the only evidence relied on by the requesting state at the end of the case), and took into account the frailties of his evidence. She concluded that the arguments attacked his credibility, not his reliability. She found at paras. 91-93 of the committal ruling:

> I accept that the Requesting State has stated in the SSROC that it was a condition of Downing's plea agreement that he cooperate in the prosecution of others, and a failure to abide

> by these conditions could constitute a breach of his plea and sentencing agreement and could result in a reopening of his case. In my view, this is evidence that supports the Requesting State's assertion that the evidence of Downing is available for trial, as he has an incentive to appear as a witness at trial. It is not an improper attempt to threaten a witness or influence this court, as submitted by counsel for Mr. Boyachek.

> Again, the arguments advanced by counsel for Mr. Boyachek all simply attack the evidence of Downing as not credible because his evidence was obtained as part of a plea agreement. The argument that the evidence of a co-conspirator given as part of a plea agreement is inherently weak is an argument that goes to credibility of the witness and can be advanced at the trial but this alone is not enough to undermine the sufficiency of the evidence on extradition: see *Scarpitti v. United States of America*, 2007 BCCA 498 (leave to appeal refused, [2007] S.C.C.A. No. 620); *United States of America v. Rosenau*, 2010 BCCA 461 (leave to appeal refused, [2010] S.C.C.A. No. 465).

> The submissions of counsel for Mr. Boyachek do not go so far as to establish that the evidence of Downing is so defective and unreliable that no jury, properly instructed, could convict based on it.

## Minister of Justice's Surrender Order

[45]    Mr. Boyachek raised a number of issues before the Minister. First, he argued that the ROC, SROC and SSROC were not properly certified, an issue not raised before the extradition judge. The Minister pointed out that the issue of certification is for the extradition judge, not for him.

[46]    The Minister was also asked to consider the November 2012 affidavits of Mr. Downing and Ms. Steernberg, which were ultimately not admitted by the extradition judge. The Minister concluded that the issue of reliability was for the extradition judge, and in any event, Mr. Boyachek's surrender based on the evidence was not unjust or oppressive, nor a violation of s. 7.

[47]    Mr. Boyachek further argued that the Minister should not extradite him on the basis that the AUSA was abusive in both drafting the materials for extradition and in drafting Mr. Downing's plea agreement. The Minister concluded that the allegation of prosecutorial misconduct was unfounded, and found no substance to the allegation of abuse of process.

[48]    The Minister also addressed the harshness of the United States sentencing regime, the personal characteristics and good character of Mr. Boyachek, as well as his mobility rights pursuant to s. 6(1) of the *Charter*.

## Issues on Appeal

Mr. Boyachek alleges three errors by the extradition judge:

    a)    the extradition judge erred in excluding the evidence of Mr. Downing;

    b)    the extradition judge erred in committing Mr. Boyachek for extradition; and

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 16 of 28

c)      the extradition judge erred in failing to find that the requesting state had engaged in an abuse of process.

[49]    Mr. Boyachek alleges two errors by the Minister of Justice (and I quote):

a)      "The Minister erred by failing to observe a principle of natural justice, procedural fairness, or other procedure that he was required by law to observe, by basing his decision to surrender on erroneous findings of fact in a perverse or capricious manner without regard for the material before him, and by acting on the fraudulent representations of the Requesting State, contrary to section 18.1(4)(b)(d) and (e) of the *Federal Courts Act*, R.S.C. 1985, c. F-7"; and

b)      "The Minister erred by refusing to exercise his jurisdiction by declining to declare that the Requesting State had engaged in an abuse of process"

## Discussion

## The Committal Phase

### *The Statutory Framework*

[50]    Section 29(1)(a) of the *Extradition Act* sets out the rule for committal:

29. (1) A judge shall order the committal of the person into custody to await surrender if

(*a*) in the case of a person sought for prosecution, there is evidence admissible under this Act of conduct that, had it occurred in Canada, would justify committal for trial in Canada on the offence set out in the authority to proceed and the judge is satisfied that the person is the person sought by the extradition partner; and ...

Sections 32 and 33 provide the guidelines for the admission of evidence:

32. (1) Subject to subsection (2), evidence that would otherwise be admissible under Canadian law shall be admitted as evidence at an extradition hearing. The following shall also be admitted as evidence, even if it would not otherwise be admissible under Canadian law:

(*a*) the contents of the documents contained in the record of the case certified under subsection 33(3);

(*b*) the contents of the documents that are submitted in conformity with the terms of an extradition agreement; and

(*c*) evidence adduced by the person sought for extradition that is relevant to the tests set out in subsection 29(1) if the judge considers it reliable.

(2) Evidence gathered in Canada must satisfy the rules of evidence under Canadian law in order to be admitted.

33. (1) The record of the case must include

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 17 of 28

> (a) in the case of a person sought for the purpose of prosecution, a document summarizing the evidence available to the extradition partner for use in the prosecution;
>
> ...
>
> (2) A record of the case may include other relevant documents, including documents respecting the identification of the person sought for extradition.
>
> (3) A record of the case may not be admitted unless
>
> > (a) in the case of a person sought for the purpose of prosecution, a judicial or prosecuting authority of the extradition partner certifies that the evidence summarized or contained in the record of the case is available for trial and
> >
> > > (i) is sufficient under the law of the extradition partner to justify prosecution, or
> > >
> > > (ii) was gathered according to the law of the extradition partner;
> >
> > ...
>
> (4) No authentication of documents is required unless a relevant extradition agreement provides otherwise.
>
> (5) For the purposes of this section, a record of the case includes any supplement added to it.

### Test for Committal

[51]    The test for committal pursuant to s. 29 of the *Extradition Act* is "whether or not there is any evidence upon which a reasonable jury properly instructed could return a verdict of guilty" (see *Ferras* at para. 9, citing *United States of America v. Shephard*, [1977] 2 S.C.R. 1067 at p. 1080).

[52]    In *Ferras*, the Court clearly identified the importance of the judicial phase of an extradition hearing – that it must be independent in appearance and substance, and provide "real protection" against extradition when there is an inadequate case brought (para. 23).

[53]    In addition, the Court in *Ferras* considered the constitutionality of the provisions of the *Extradition Act* dealing with the admission of evidence, and provided an interpretation consistent with the *Charter*.

[54]    Prior to *Ferras*, under the test in *Shephard*, a judge had no discretion to exclude evidence it considered unreliable in the extradition context. The Court in *Ferras* concluded that this standard deprived a person from receiving a fair extradition hearing (*Ferras* at para. 41), violating s. 7 of the *Charter*.

[55]    To address the constitutional requirement, the Court concluded that an extradition judge has the ability to "engage in limited weighing of the evidence to determine, not ultimate guilt, but sufficiency of evidence for committal to trial" (*Ferras* at para. 46).

[56]    The Court concluded at para. 50:

I conclude that s. 32(1)(*a*) and (*b*) and s. 33 of the 1999 Act do not violate the right of a person sought under s. 7 of the *Charter*, because the requirements for committal of s. 29(1), properly construed, grant the extradition judge discretion to refuse to extradite on insufficient evidence such as where the reliability of the evidence certified is successfully impeached or where there is no evidence, by certification or otherwise, that the evidence is available for trial.

[57]   However, the Court in *Ferras* also affirmed that the certification requirement meant that the requesting state had provided its "good word that the evidence meets the requirements set out in s. 33 (3)" (para. 30). Therefore certification results in a presumption of reliability, absent a challenge (para. 52). The person sought for extradition may challenge the sufficiency of the case, including the reliability of certified evidence, and the extradition judge may admit evidence under s. 32(1)(c) from the person sought if the "judge considers it reliable" (para. 53).

[58]   The Court said this regarding the process of challenging the justification for committal (paras. 54, 58):

> Challenging the justification for committal may involve adducing evidence or making arguments on whether the evidence could be believed by a reasonable jury. Where such evidence is adduced or such arguments are raised, an extradition judge may engage in a limited weighing of evidence to determine whether there is a plausible case. The ultimate assessment of reliability is still left for the trial where guilt and innocence are at issue. However, the extradition judge looks at the whole of the evidence presented at the extradition hearing and determines whether it discloses a case on which a jury could convict. If the evidence is so defective or appears so unreliable that the judge concludes it would be dangerous or unsafe to convict, then the case should not go to a jury and is therefore not sufficient to meet the test for committal.
>
> ...
>
> This is not an onerous burden. Indeed, where actual first-hand evidence (e.g., documentary evidence or first-hand affidavits) is put before an extradition judge, the evidence's existence is self-evident and its availability for trial will be presumed. Similarly, where evidence is certified as available by a requesting state, that certification results in a presumption of availability for trial. However, cases might arise where a person sought could cogently challenge the presumption of availability of evidence for trial. For example, where a person sought can show that a requesting state relies on evidence of a witness who, prior to the extradition hearing, retracted his or her statement, the availability of that evidence for trial may be brought into doubt. Another example is where a state makes only a bare assertion that evidence exists without providing any description whatsoever of its content or form. In such a case, the availability of the evidence may be in doubt. Furthermore, an extradition judge does not make a prediction about the future state of the evidence. He or she makes a common sense determination about whether the evidence exists and is available for trial — *at the time of the extradition hearing* — based on the evidence itself, any circumstantial guarantees of availability (such as certification) and any evidence tendered to dispute the presumption of availability for trial.

[59]   The Court made it clear that the extradition judge was to assess only "threshold reliability" as the ultimate assessment of reliability is left for the trier of fact at trial. The Court found that to be constitutionally valid, the extradition provisions needed to be interpreted in a way that permitted the

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 19 of 28

extradition judge to have a limited weighing role to determine whether the evidence was so defective or so unreliable that it would be dangerous or unsafe to convict, and thus, not sufficient to base a committal for extradition.

*Analysis*

[60]    Mr. Boyachek relies on a number of decisions that discuss the admission of hearsay evidence in a domestic trial for the truth of its contents. These include *R. v. Khan*, [1990] 2 S.C.R. 531; *R. v. Khelawon*, [2006] 2 S.C.R. 787; and *R. v. Youvarajah*, 2013 SCC 41, to name a few.

[61]    Mr. Boyachek attempts to draw an analysis between *threshold reliability* in the context of the admissibility of hearsay statements, engaging the principles of necessity and reliability, and *threshold reliability* in the extradition context. In my respectful opinion, the analysis of the admission of hearsay evidence is not helpful in the extradition context as it compares apples and oranges. The admission of hearsay evidence in the domestic context involves admitting the evidence for the truth of its contents when the veracity of the evidence cannot be tested by cross-examination. In the extradition context, the extradition judge is examining whether evidence certified by a requesting state, which will eventually be tested and under the scrutiny of a court in the foreign jurisdiction, is so unreliable that it cannot base a finding for committal. Although both analyses use the word "*threshold*", one is examining the threshold for admissibility (hearsay), while the other is examining presumptively admissible evidence to determine whether it should be excluded in the extradition context. In other words, the first examines the circumstances that give the evidence a guarantee of trustworthiness to the point that it should be admitted for the truth of its contents. The second examines evidence that is presumptively trustworthy, but is so qualitatively or quantitatively poor, either on its face or in contrast with other evidence, that it cannot base a finding for committal. Thus, in my view, the indicia of reliability are not comparable.

[62]    Here, we have the extraordinary case where the main witness appears to have sworn an affidavit recanting his testimony. This is one of the examples given in *Ferras* in which an extradition judge might refuse to admit the evidence on the basis that it was not "available". There is, however, a distinction between the witness being available and the evidence being available (see *United States of America v. Graham*, 2007 BCCA 345 at para. 12, leave to appeal refused [2007] S.C.C.A No. 467). For example, even if Mr. Downing refused to cooperate, the SSROC identified Mr. Downing's evidence before the Grand Jury as evidence that could be tendered in court, and therefore "available". The SSROC also referenced the provisions found in the *Mutual Legal Assistance in Criminal Matters Act*, R.S.C. 1985, c. 30 (4th Supp.), s. 22.1 whereby Mr. Downing could be compelled to testify via video-conference, and his evidence would therefore be "available".

[63]    In this case, however, the recantation is not the end of the matter. In his June 2013 affidavit Mr. Downing suggests that he did not actually read or swear the recanting affidavit, and that it was not drafted by Mr. Botting in accordance with Mr. Downing's instructions.

[64]    The extradition judge concluded that she was left with a situation of competing affidavits which, while affecting the credibility of Mr. Downing depending on which version was accepted, did not undermine his evidence to the point of being so unreliable that it would deprive Mr. Boyachek of a fair hearing.

[65]    When she reconsidered the evidence, the extradition judge found she no longer had evidence that was directed to an issue before her. Rather than going to reliability, the evidence went to an issue of credibility, which was for the trier of fact. She concluded that on a close reading of Mr. Downing's November 2012 affidavit, it did not amount to a recantation of the evidence found in his plea agreement. She found that there was no basis to conclude that the affidavit amounted to an express denial of the bulk of the matters attributed to him by the requesting state. Therefore, she reversed her decision and did not admit the evidence tendered by Mr. Boyachek. She concluded that even if the November 2012 affidavit was considered, it did not go so far as to indicate that the ROC was manifestly unreliable. She held that "[o]nce the November 2012 Affidavit is stripped of its hyperbole and opinions and is not supplemented by the expansive submissions of counsel, it does not go very far at all" (reconsideration ruling at para. 69).

[66]    In my respectful view, the extradition judge did not err in her conclusion that the affidavit of Mr. Downing tendered by Mr. Boyachek was not admissible.

[67]    The extradition judge was left with the anticipated evidence of Mr. Downing in the three ROC's. She concluded that his evidence, along with the circumstantial evidence (finding large quantities of money tied to Mr. Boyachek) was sufficient to support the order for committal.

[68]    In my respectful opinion, she committed no error in this regard.

**Abuse of Process**

[69]    On appeal, and for the first time, Mr. Boyachek submits that the extradition judge should have stayed the extradition proceedings as an abuse of process because of the conduct of the AUSA, Mr. Reinert.

[70]    Despite the issue not raised before her, the extradition judge considered the conduct of Mr. Reinert and concluded that it did not amount to an abuse of process.

[71]    The extradition judge found that Mr. Reinert was "less careful than he should have been" in writing the summary of evidence in the ROC, and that the ROC had the potential to mislead the court.

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 21 of 28

The extradition judge further recognized that it is a "serious problem" when the requesting state provides a misleading ROC, and that such conduct can justify rejecting the request for extradition. However, she found that the requesting state's conduct did not amount to an abuse of process in this case (committal ruling at paras. 51-54).

[72]    In addition, the extradition judge considered the following statement made by Mr. Reinert in the SSROC:

> As a condition of Mr. Downing's sentence and plea bargain, he agreed to cooperate in the prosecution of others, including Mr. Boyacheck, and further agreed he had a continuing obligation to continue to cooperate. A failure by Mr. Downing to abide by those conditions may constitute a breach of his plea and sentencing agreement, which may result in reopening his case.

[73]    The extradition judge took this comment by Mr. Reinert into account on the committal hearing, and concluded that it was "not an improper attempt to threaten a witness or influence this court, as was submitted by counsel for Mr. Boyachek" (committal ruling at para. 91).

[74]    In my view, the extradition judge did not err by failing to stay the proceedings on the basis of an abuse of process.

[75]    I would dismiss the appeal against the order for committal.

## Minister of Justice Surrender Order

### *Standard of Review*

[76]    The decision of the Minister to surrender a person sought by a requesting state is subject to substantial deference and a standard of reasonableness as noted in *Lake v. Canada*, 2008 SCC 23 at paras. 34 and 41.

### *Legal Parameters*

[77]    The Minister must refuse to surrender a person if the surrender would be "unjust or oppressive having regard to all the relevant circumstances". Section 44(1)(a) of the *Extradition Act*:

> 44. (1) The Minister shall refuse to make a surrender order if the Minister is satisfied that
>
> > (a) the surrender would be unjust or oppressive having regard to all the relevant circumstances; or

[78]    Pursuant to s. 57(7) of the *Extradition* Act, this Court may grant relief from the decision of the Minister based on the grounds of s. 18.1(4) of the *Federal Courts Act*, R.S.C. 1985, c. F-7:

> *Extradition* Act

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 22 of 28

57 (7)    The court of appeal may grant relief under this section on any of the grounds on which the Federal Court may grant relief under subsection 18.1(4) of the *Federal Courts Act*.

*Federal Courts Act*

18.1 (4)    The Federal Court may grant relief under subsection (3) if it is satisfied that the federal board, commission or other tribunal

(a) acted without jurisdiction, acted beyond its jurisdiction or refused to exercise its jurisdiction;

(b) failed to observe a principle of natural justice, procedural fairness or other procedure that it was required by law to observe;

(c) erred in law in making a decision or an order, whether or not the error appears on the face of the record;

(d) based its decision or order on an erroneous finding of fact that it made in a perverse or capricious manner or without regard for the material before it;

(e) acted, or failed to act, by reason of fraud or perjured evidence; or

(f) acted in any other way that was contrary to law.

[79]    The Minister does not resolve credibility issues that arise from the evidence of the witnesses. That issue was squarely before this Court in *Republic of India v. Singh*, 2007 BCCA 157. In that case, the Minister was provided with the recantation of a key witness, a statutory declaration of a co-accused admitting the offence, and the affidavit of Mr. Singh providing an alibi. This Court concluded that the Minister's role does not include the weighing of credibility that arises from opposing evidence (paras. 55-56).

[80]    In *United States of America. v. Lucero-Echegoyen*, 2013 BCCA 149, however, this Court held that in a case where the weakness of the requesting state is evident, and the person sought faces serious hardship, the Minister should take into account the strength of the requesting state's case when determining if it would be unjust or oppressive to surrender the person sought (paras. 29-30). In Mr. Lucero-Echegoyen's case, there was a body of evidence indicating that he was in detention in Canada when the alleged offence occurred in the United States.

### The Minister's Consideration of the Evidence

[81]    Mr. Boyachek's argument appears to be that the Minister misstated the evidence, did not weigh the committal evidence and proceeded on a "deeply flawed and fraudulent record of the case".

[82]    Mr. Boyachek argues that the Minister's decision was based on evidence that was improperly considered as it was not established as fact. He outlines a number of passages in the reasons of the Minister and argues that the Minister misstated the evidence, overlooked the evidence, drew wrong conclusions from the evidence or was misled. He relies on these parts of the decision to establish that

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 23 of 28

the Minister should have concluded that it would be unjust and oppressive to surrender
Mr. Boyacheck, and that there was an abuse of process.

[83]    Mr. Boyachek has raised many points arising from the Minister's reasons for surrender. I will
deal with a number of them in brief compass. In my respectful view, none of the points raised by
Mr. Boyachek are of such a nature that any or all cumulatively should result in relief on the basis set
out in s. 18.1(4) of the *Federal Courts Act* or amount to being unjust or oppressive.

i)     *The Minister relied on Mr. Downing's evidence that the Chicago police found $738,650
in Mr. Boyachek's locker. Mr. Boyacheck argues that Mr. Downing had no personal
knowledge of this seizure, despite the fact the ROC indicates he was aware of it.*

Whether Mr. Downing had personal knowledge of the seizure is of no moment, as the ROC
states that the money was found by the Chicago County police and suggests this evidence is
available for trial.

ii)    The Minister found that Mr. Downing's drug ledgers implicate Mr. Boyachek.
Mr. Boyachek argues that he is not named in the ledgers.

Mr. Downing says that he detailed Mr. Boyachek's involvement in the drug activity, which,
parenthetically, would implicate Mr. Boyachek. Thus, this does not amount to an error.

iii)   *The Minister relied on the evidence that Mr. Downing lived with Mr. Boyachek, despite
affidavit evidence from Mr. Downing and Ms. Steernberg stating that Mr. Boyachek left when
he learned that Mr. Downing was involved in drugs, and the Minister failed to draw the
inference that this falling out was a motive for Mr. Downing to lie.*

Mr. Downing disavowed this evidence in a subsequent affidavit that the Minister had in his
material. As set above, it is not for the Minister to assess the credibility of witnesses, and thus
he did not fall into error on this point.

iv)    *The Minister wrongly identified Ms. Steernberg as a co-accused, when she was
presented at the extradition hearing as a witness, and did not have evidence to give to
implicate Mr. Boyachek.*

This submission ignores the fact that Ms. Steernberg was a co-accused, and that her evidence
was not considered by the extradition judge in any event.

v)     *The Minister blindly accepted the "plea agreement" despite the fact that the plea
agreement was only a statement of the theory of the prosecution.*

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 24 of 28

The plea agreement set out the bases on which Mr. Downing pleaded guilty, and set out in part the case against Mr. Boyachek as anticipated evidence of Mr. Downing. The Minister committed no error in considering the plea agreement.

vi)     *The Minister found that there was no evidence that the guilty plea agreement was reached as a result of threats and coercion by the prosecutor, and ignored the promise of a light sentence if Mr. Downing cooperated, and threat of a heavier one if he did not, in addition to the threat to recommence proceedings if he did not continue to cooperate.*

This argument overlooks the Minister's analysis responding to this allegation, found at p. 6 of his decision:

> In this regard, I note that, according to the SSROC, Mr. Downing provided, on several occasions, evidence consistent with the facts contained in his plea agreement. He did so in interviews with U.S. law enforcement authorities; on oath before the U.S. sentencing court at his plea and sentencing hearing, where he had legal representation; and in his sworn testimony before a U.S. Grand Jury. The plea agreement was signed by Mr. Downing and each paragraph initialled by him. The facts contained therein directly implicate Mr. Boyachek in the alleged conspiracy. Moreover, as set out in the SSROC, Mr. Downing's U.S. counsel has confirmed that his client, who is currently in Canada, is willing to voluntarily return to the United States to testify at Mr. Boyachek's trial.

vii)    *The Minister concluded that Mr. Downing will testify when only his lawyer said he would testify.*

This is a spurious observation. The Minister was entitled to rely on the word of Mr. Downing's lawyer on his behalf.

[84]    Mr. Boyachek summarizes his argument in the following way in his factum:

> [28]    The Minister's misapprehension of the underlying facts and acceptance of the speculative surmise and creative drafting of AUSA Reinhert is an error that renders his surrender decision unjust. Given the potential consequences for Mr. Boyachek, the decision relying on the erroneous facts was made in a perverse or capricious manner without regard for the material before him, contrary to section 18.1(4)(d). Furthermore, he acted on the deeply flawed and fraudulent record of the case, contrary to section 18.1 (e) of the Federal Courts Act.

[85]    I would not give effect to this argument for the reasons noted above.

### *Abuse of Process*

[86]    Mr. Boyachek also submits that the surrender order should be stayed on the basis that there was an abuse of process. His argument is summarized in para. 43 of his factum:

> This is borne out by the very fact that the Authority to Proceed was issued in response to the Department of Justice receiving the ROC. Had the Minister of the time *known* of U.S.

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 25 of 28

prosecutor's lack of objectivity and distortion of the facts he would surely not have issued the ATP against Mr. Boyachek in the first place.

[87]     The Minister set out the submissions of Mr. Boyachek and said this in response to his argument:

> Abuse of process is incorporated into the principles of fundamental justice codified by section 7 of the *Charter (United States of America* v. *Cobb*, [2001] 1 SCR 587). Therefore, your assertion that the U.S. prosecutor acted in bad faith in this case is relevant to my assessment of whether surrender is warranted. I must consider whether the actions of the U.S. authorities amount to misconduct or bad faith, and whether those actions have tainted the extradition process to such a degree that surrender would be unconscionable. In this regard, I note that a finding of abuse of process will be extremely rare and must only be made in the clearest of cases (*United States of America* v. *Cobb*, *supra; R.* v. *Conway*, [1989] 1 SCR 1659).
>
> I am satisfied that this is not a case in which such a finding should be made.
>
> The information before me does not support your assertion that Mr. Reinert has acted with *mala fides* in this case, either in his presentation of the evidence in support of extradition or in the drafting of Mr. Downing's plea agreement.
>
> Although the extradition judge found that Mr. Reinert "was less careful than he should have been in the way in which he wrote the summary of evidence in the ROC" and that he "was argumentative and careless in inserting Mr. Boyachek's name in places in the ROC when this was his conclusion rather than the actual evidence of witnesses", she ultimately concluded that this did not amount to an abuse of process and there was no attempt to mislead the court. In making this finding, she noted that counsel for the Attorney General of Canada had "readily conceded" that Mr. Downing was the only witness named in the evidentiary materials in support of extradition that implicated Mr. Boyachek in the alleged drug trafficking conspiracy.
>
> I am satisfied that none of the materials before me establish that the American authorities, including Mr. Reinert, acted in bad faith in the manner in which they presented their evidence in support of Mr. Boyachek's extradition. The reference to witnesses that were ultimately found not to incriminate him is not, in my view, proof of improper motive on the part of the United States.
>
> The extradition judge was satisfied that Mr. Downing's evidence, as set out in the SSROC, together with drug ledgers seized by U.S. authorities, established a *prima facie* case for Mr. Boyachek's committal. In this regard, I note that there is no requirement for a Requesting State to provide all of the evidence that is available against a person sought for extradition, but only sufficient evidence to meet the test for committal under the *Act*. (*United States of America* v. *Dynar*, [1997] 2 SCR 462). I also note that a Requesting State is entitled to withdraw some of the evidence originally presented in their evidentiary materials in support of extradition, as was done in this case, and that this does not constitute abusive conduct (*United States of America* v. *Graham*, 2005 BCSC 559, aff'd 2007 BCCA 345, leave to appeal refused [2007] SCCA No. 467).
>
> With respect to your claim that Mr. Downing was pressured by the U.S. authorities into entering into his plea agreement, I have already concluded that this assertion has no merit.
>
> As I noted previously, Mr. Downing's plea agreement is based on information he provided to U.S. law enforcement officials and, after signing his plea agreement, he testified to the same facts under oath before a U.S. court, at which time he was represented by legal counsel. He subsequently testified under oath before a Grand Jury, consistent both with his earlier statements and the facts contained in his plea agreement. Further, Mr. Downing's U.S. attorney has confirmed that his client will voluntarily return to the United States to testify at Mr. Boyachek's trial. There is no information before me suggesting that Mr. Downing was

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 26 of 28

> coerced or threatened into entering into a plea of guilty and cooperating with the American authorities.
>
> Based on all of the information before me, I am satisfied that the U.S. authorities, including Mr. Reinert, have not acted improperly with respect to the drafting of the ROC, its supplements or in drafting Mr. Downing's plea agreement.
>
> I am also satisfied that, if the U.S. prosecuting authorities were to rely, at trial, on evidence that was found, at the extradition hearing, not to implicate Mr. Boyachek, this would not amount to an abuse of process. It will be for the trier of fact in the United States to ultimately determine whether the evidence presented by the prosecuting authorities is sufficient to warrant a conviction. As noted above, Mr. Boyachek will have an opportunity to raise, with the U.S. courts, any concerns he has with the evidence presented against him, including with respect to the reliability and credibility of Mr. Downing.
>
> Your serious claims of prosecutorial misconduct are not supported by the information that is before me. Therefore, I have concluded that Mr. Boyachek's surrender to the United States would not be unjust or oppressive, or contrary to the principles of fundamental justice, notwithstanding your assertions.

[88]     The Minister applied the correct legal test, as found in *United States of America v. Cobb*, [2001] 1 S.C.R. 587 at para. 38: a stay of proceedings is only available in the "clearest of cases".

[89]     There are live credibility issues in this case, raised perhaps as a result of the conduct of counsel for Mr. Boyachek. The extradition judge, however, concluded that there was no basis for an abuse of process. The extradition judge concluded that Mr. Downing was not threatened or coerced to testify or cooperate with the police. She acknowledged that according to the SSROC, "it was a condition of Downing's plea agreement that he cooperate in the prosecution of others, and a failure to abide by these conditions could constitute a breach of his plea and sentencing agreement and could result in a reopening of his case" (committal ruling at para. 91). She concluded that this was not an improper attempt to threaten a witness or influence this court (committal hearing at para. 91). In addition, she found that while Mr. Reinhart was "argumentative and careless", his conduct did not amount an abuse of process (committal ruling at para. 51-54).

[90]     No new evidence has been filed to support the allegation of abuse of process before the Minister. For the same reasons that I find there was no abuse of process on appeal (see paras. 70-74 above) I also find that the Minister did not err by finding that the requesting state had not engaged in an abuse of process.

[91]     In my respectful view, there is no error found in the reasons for surrender of the Minister. I would dismiss the judicial review.

[92]     In conclusion, I would dismiss the appeal from the committal hearing and I would dismiss the judicial review.

"The Honourable Madam Justice Bennett"

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 27 of 28

I agree:

"The Honourable Mr. Justice Donald"

I agree:

"The Honourable Mr. Justice Goepel'

Case 6:09-cr-02027-MWB-JSS   Document 17   Filed 03/31/15   Page 28 of 28