IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Number CR 09-2027 |
| | ) | |
| JASON LEONARD BOYACHEK, | ) | |
| | ) | |
| Defendant. | ) | |

## __*DEFENDANT'S AMENDED SENTENCING MEMORANDUM*__

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................... 2

      A.    Witnesses ........................................................................ 2

      B.    Exhibits ........................................................................... 2

      C.    Issues to Be Resolved at the Sentencing Hearing ............. 4

II.   SENTENCING ISSUES ............................................................ 4

      A.    Defendant's Proposed Guideline Calculation.................... 4

      B.    18 U.S.C. § 3553(a) Considerations and Motion for
            Downward Variance ........................................................ 5

            1.    Nature and Circumstance of the Offense................. 7

            2.    History and Characteristics of the Defendant ......... 9

      C.    The Need for the Sentence Imposed ................................ 12

1

D.   Kind of Sentences Available and the Need to Avoid
     Unwarranted Sentencing Disparities ............................. 14

E.   Sentencing Recommendation ......................................... 16

## I.   INTRODUCTION

The Defendant notifies the court, the United States and the United

States Probation Office of the following:

A.   <u>Witnesses</u>:  Jan Boyachek

B.   <u>Exhibits</u>

The Defendant anticipates offering the following exhibits at the sentencing

hearing in this matter:

1.   Exhibit A:   Correspondence from Hara Nikolopoulos

2.   Exhibit B:   Correspondence from David Ashcroft

3.   Exhibit C:   Correspondence from Tessa Anadarko

4.   Exhibit D:   Correspondence from Ryan Whitehead

5.   Exhibit E:   Correspondence from Dave Guthrie

6.   Exhibit F:   Correspondence from Jodi Ratcliffe

7.   Exhibit G:   Correspondence from Ryan Ashby and
                  Charity Ashby

8.   Exhibit H:   Correspondence from Shannon Loughran

9.   Exhibit I:   Correspondence from Clint Tarala and
                  Jennifer Harper

| | | |
|---|---|---|
| 10. | Exhibit J: | Correspondence from Monika Karpinska |
| 11. | Exhibit K: | Correspondence from Jodi Murphy |
| 12. | Exhibit L: | Correspondence from John Antoniuk and Jennifer Lane |
| 13. | Exhibit M: | Correspondence from Jan Boyachek and Ted Boyachek |
| 14. | Exhibit N: | Correspondence from Dustin Boyachek |
| 15. | Exhibit O: | Correspondence from Tara Drouin and Danny Drouin |
| 16. | Exhibit P: | Correspondence from Leigha Stankewich |
| 17. | Exhibit Q: | Correspondence from Terry Boyachek and Cheryl Boyachek |
| 18. | Exhibit R: | Correspondence from Wendy Stankewich and Daryl Stankewich |
| 19. | Exhibit S: | Correspondence from Twyla Kastrukoff and Lyle Kastrukoff |
| 20. | Exhibit T: | Correspondence from Leonard Trevellyan and Joyce Trevellyan |
| 21. | Exhibit U: | Correspondence from Dr. J. Gordon Reid (to be offered under seal) |
| 22. | Exhibit V: | Correspondence from Emily Boekelheide, Cranbrook Community Corrections |
| 23. | Exhibit W: | Notice of Discontinuance, Supreme Court of Canada |
| 24. | Exhibit X: | Correspondence from Juliana Steernberg |

3

| 25. | Exhibit Y: | Client History Report, Ministry of Public Safety and Solicitor General, British Columbia (with key) |
|---|---|---|
| 26. | Exhibit Z: | Excerpt from Discovery Materials (to be offered under seal) |
| 27. | Exhibit AA | Excerpt from VoiceOnline.com, June 5, 2015 |

The Defendant reserves the right to offer additional exhibits responsive to or in rebuttal of exhibits offered by the government at the Defendant's sentencing hearing.

  C. <u>Issues to Be Resolved at the Sentencing Hearing</u>

    1. Whether the Defendant should be granted a downward departure or variance pursuant to 18 U.S.C. § 3553(a).

## II. **SENTENCING ISSUES**:

  **A. Defendant's Proposed Sentencing Guideline Calculation.**

In the plea agreement (Doc. 40) the United States and Defendant Jason Boyachek stipulated that based on his guilty plea to conspiracy to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, the base offense level under Guideline § 2D1.1 is 32 and, if the Defendant receives a mitigating role in the offense, his base offense level should be reduced by two levels under

Guideline § 2D1.1(a)(5).

In the plea agreement, the parties further stipulated that Boyachek's role in the offense warrants a two-level reduction for minor role under Guideline § 3B1.2; that should he be eligible for the "safety value" under 18 U.S.C. §3553(f) and Guideline § 5C1.2, he would be eligible for an additional two-level reduction under Guideline § 2D1.1(b)(17); and that he is entitled to a Chapter 3 adjustment under Guideline § 3E1.1(b) for acceptance of responsibility.

Boyachek concurs in the probation office's determination that his total offense level is 23, and that he has a criminal history category I, yielding an advisory guideline range of 46 to 57 months.

## B.   18 U.S.C. § 3553(a) Considerations and Motion for Downward Variance.

The United States Court of Appeals for the Eighth Circuit in United States v. Chase, 560 F.3d 828 (8th Cir. 2009), described the broad flexibility afforded sentencing courts imposing sentences tailored to fit not only the crime but the criminal:

> Factors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in deciding whether to grant a variance. In fashioning a "sentence sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), "district courts are not only permitted, but required, to consider 'the history and characteristics of the defendant.'" As a consequence, factors such as a defendant's age, medical condition, prior military service, family obligations,

5

entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure. . . .  In addition, factors that have already been taken into account in calculating the advisory guideline range, such as a defendant's lack of criminal history, can nevertheless form the basis of a variance.

560 F.3d at 830 (internal citations omitted).

Counsel respectfully requests that a downward departure or variance is warranted based on:

a. The Defendant's character and mental health made him particularly susceptible to the undue influence of others;

b. The Defendant has absolutely no criminal history;

c. The Defendant voluntarily withdrew from the criminal activity giving rise to his prosecution;

d. While under supervision during the extradition proceedings in Canada, the Defendant scrupulously abided by all conditions imposed by the court and supervising authorities;

e. A guideline sentence would create an unwarranted sentencing disparity compared to others involved in the conspiracy to which the Defendant pleaded guilty;

f. By his employment history, educational achievements, initiative in obtaining mental health treatment, and developing appropriate personal relationships, the Defendant has demonstrated noteworthy post-offense rehabilitation;

g. As a non-citizen, the Defendant will face harsh restrictions in attempting ever to return to the United States;

6

   h.  The Defendant may be subjected to significant restrictions in placement and programing within the Bureau of Prisons;

   i.  The Defendant possesses an otherwise outstanding character, and has been highly regarded and loved for his personal generosity and many kindnesses;

   j.  The Defendant represents a very low risk of recidivism.

### 1. Nature and Circumstance of the Offense.

As outlined in the presentence report, Boyachek became acquainted with David Downing in 2000 when Boyachek and several others occasionally trimmed marijuana plants near Vancouver, British Columbia. (PSR ¶ 28). Approximately two years later, Boyachek declined an invitation by one of Downing's associates to transport marijuana from Canada to the United States, but was persuaded to drive drug proceeds from Chicago to Seattle, where the money was eventually couriered by others to Canada. (PSR ¶ 29). In March, 2003, preparing to deliver a sizable cache of currency from Chicago to the northwest United States, Boyachek was stopped by law enforcement agents after boarding a train in Chicago. The currency Boyachek was transporting was seized, resulting in an enormous debt for which Boyachek was held responsible and earning him the distrust of those to whom the monies were destined. (PSR ¶ 30).

Intending to "lay low" in Chicago, Boyachek went to work for a building contractor in the city where, in 2004 and 2005, he became reacquainted with David

Downing and others involved in Downing's drug trafficking enterprise. (PSR ¶ 32). Importantly, Downing kept Boyachek in the dark about the scope of his drug trafficking enterprise, belittled Boyachek's "nerdiness" and failure as a money courier, and engaged in flagrant drug use leading Boyachek to move away from and sever his ties with Downing. (Defendant's Exhibit X). Planning to return to Canada, Boyachek rented a storage locker in Chicago to hold some of his household goods – a locker to which Downing and one of Downing's confederates had access. In late 2006, while Boyachek was visiting a friend in Canada, Downing's associate stored United States currency in Boyachek's locker, which was later searched and the currency seized by investigators. In early 2007, Boyachek was "coached" into claiming the seized currency even though he never received any of the proceeds. (PSR ¶ 22). Though he had effectively withdrawn[1]

---

[1] In its response to Boyachek's motion for downward variance (Doc. 50, p.3), the government asserts that Boyachek's withdrawal was little more than a cessation of criminal behavior, and fails to "demonstrate that he took affirmative action to withdraw from the conspiracy by making a clean breast to the authorities or by communicating his withdrawal in a manner reasonably calculated to reach his conconspirators," citing *United States v. Jackson*, 345 F.3d 638, 648 (8ᵗʰ Cir. 2003) and *United States v. Zimmer*, 299 F.3d 710, 718 (8ᵗʰ Cir. 2002). In fact, Boyachek made clear to Downing drug courier Juliana Steernberg "that he didn't want to be around or have anything to do with David Downing." (Exhibit X). Secondly, as the Court of Appeals discussed in *United States v. Spotted Elk*, 548 F.3d 641, 675-676 (8ᵗʰ Cir. 2008)(distinguishing *Zimmer* and *Jackson* as inapplicable to assessment of relevant conduct for sentencing), "[T]he scope of substantive liability for conspiracy and relevant conduct are not co-extensive." Finally, the government erroneously states that Boyachek returned to Canada *after* the seizure

8

from any illicit activities in the United States[2], Boyachek was coerced into making a final currency delivery in Canada in mid-2007. (PSR ¶ 34). Boyachek never himself delivered any marijuana.

On September 11, 2011, Boyachek was arrested in Canada on an extradition warrant, and, on the advice of Canadian counsel, took advantage of the remedies accorded him under Canadian law and contested the allegations on which his extradition was sought. On March 5, 2015, he discontinued the appeal of his committal for extradition and surrendered to Canadian authorities for his eventual return to the United States. (Defendant's Exhibit W).

## 2. <u>History and Characteristics of the Defendant</u>.

The son of a retired couple living in the small town of Kimberley in the East Kootenay district of British Columbia, Canada, Boyachek enjoyed – and continues to enjoy – the benefits of a close, loving family. Growing up in a province rich with natural beauty and abundant opportunities for outdoor recreation, Boyachek developed strong aptitudes in a variety of athletic pursuits (Defendant's Exhibits E, H). Throughout his childhood and adult life, he has exhibited a strong devotion to

of money from his Chicago storage unit. As stated above, he was in Canada at the time of the seizure, and was not fleeing from justice.

[2] The discovery materials and border authority records reveal that Boyachek's last time in the United States – prior to his surrender – was November, 2006.

family, and has in recent years cultivated an especially strong bond with his niece and nephew who live in Kimberley (Defendant's Exhibits A, B, E, G, J, O, and R). His gentle, attentive ways with children have persuaded other parents that they would without hesitation entrust their own children with Boyachek (Defendant Exhibits B, G). Both friends and family members roundly described Boyachek as a generous, dependable friend always willing to help others when called upon. (Defendant's Exhibits D, G, L and N). Though outwardly shy, Boyachek's gentle nature has proven to be a positive influence on those around him. (Defendant's Exhibits D, H and K). As his friend of over thirty-three years observed,

> He was my companion as a child, my confidant as we became young men together, and stood beside me on my wedding day as my best man. Jason is one of the most sincere and genuine individuals I have ever known. Regardless of the situation, or what you needed from Jason, you could also count on him, and he has always kept his word. I have often thought of Jason throughout the years as an example of a man whose word is his bond.

(Defendant's Exhibit L).

After leaving the United States in 2006 (and withdrawing from the criminal activities leading to his prosecution), Boyachek returned to Vancouver where he continued to work doing home renovation projects and other small construction jobs. (Defendant's Exhibit M). As the United States Supreme Court recognized in *Gall v. United* States, 552 U.S. 38, 56-57, 128 S.Ct. 586, 600, 169 L.Ed.2d 445, 461 (2007), withdrawal from a conspiracy is critically relevant to the sentencing

10

decision, distinguishing as it does the conduct of a defendant from his codefendants, and "lending strong support to the [sentencing court's] conclusion that [the defendant] is not going to return to criminal behavior and is not a danger to society." Significantly, in 2007, Boyachek began receiving therapy from Dr. J. Gordon Reid, a psychologist in Vancouver, who documented Boyachek's past susceptibility to the manipulation of others, as well as his intense commitment to become a better person and to have heathy relationships. As Dr. Reid observed,

> At the heart of the matter, and what Jason simply could not see, was that it was exactly those personality dynamics that attracted particular types of people to him; the type of people who knew how to capitalize on Jason's vulnerabilities and weaknesses, and use them to their advantage. Jason was an ideal candidate for being manipulated, not only because of his desire to belong and to please, but also because of his unfortunate tendency to automatically assume it was his fault when things went wrong. He was in this sense, a perfect scapegoat for others; if they had a problem they could simply point the finger at Jason and he would accept it, and try to fix it. Given Jason's personality and the personalities of those who came into his life, it was really not surprising this should happen.

(Defendant's Exhibit U). In the past five years, and throughout the course of the Canadian and American legal proceedings, Boyachek has not only engaged in a steadfast mission of self-improvement (Defendant's Exhibit A, B and L), but has also committed himself to planning a career in psychology where he can bring both his skills and natural congeniality to work in helping others. (Defendant's Exhibits D, E, G, H and M). Similarly, he has nourished a loving long-term relationship

with Hara Nikolopoulos, a nutrition researcher with the University of Alberta, to whom he is now engaged and with whom he hopes to start a family of his own. (Defendant's Exhibit A). In the nearly three and one-half years during which Boyachek was on bail during the Canadian extradition proceedings, he scrupulously complied with all of the conditions of supervision and demonstrated not only his reliability but the fact that he posed no public safety risk[3]. (Defendant's Exhibit V)

## C. **The Need for the Sentence Imposed.**

As a non-citizen, Boyachek will also be subject to deportation from the United States and will be permanently inadmissible absent extraordinary circumstances. 8 U.S.C. §§ 1182(a)(2)(A)(i)(II), 1182(a)(2)(C)).

Boyachek will also be subjected to harsh consequences in the custody of the Bureau of Prisons should he be sentenced to additional confinement. The Bureau

---

[3]In its response (Doc. 50, p.4) to Boyachek's request for a downward variance, the government argues that Boyachek's post-offense rehabilitation, while laudable, is not so extraordinary as to warrant a variance, citing *United States v. Chapman*, 356 F.3d 843 (8th Cir. 2004), and *United States v. Lazenby*, 439 F.3d 928 (8th Cir. 2006). In *United States v. McGhee*, 512 F.3d 1050, 1051-1052 (8th Cir. 2008)(*per curiam),* the court rejected just such a prosecution contention: "The government's argument that the sentence is unreasonably lenient due to the absence of 'extraordinary circumstances' fails in light of *Gall*. There, while highlighting that a district court has responsibility in the first instance to provide 'sufficient justifications' that 'explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate,' *Gall*, 128 S.Ct. at 594, the Court also rejected 'an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range.'"

12

assigns deportable aliens to confinement at their second highest custody level, under normal institutional supervision and ineligible for work details or other programs outside the secure perimeter of the institution. United States Sentencing Commission, *Alternative Sentencing in the Federal Criminal Justice System*, 4 (January 2009). Absent a treaty transfer, any period of imprisonment will likely be followed by detention in the custody of Immigration and Customs Enforcement authorities since Boyachek will be subject to mandatory detention and deportation. 8 U.S.C. §§ 1226(c), 1227(2)(A)(iii). Since the United States cannot remove an alien until the home country government provides the alien with a travel document that will allow him to return home, Boyachek may be subjected to delay until a travel permit is obtained. Department of Homeland Security, Office of the Inspector General, *ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States*, 9 (February 2007).

Moreover, Boyachek stands to experience additional harsh conditions in an ICE detention center. Inadequate medical treatment; overcrowding; harsh treatment by correctional staff; housing with violent offenders; unhealthy food and unsanitary conditions; difficulty in obtaining visits from family members and legal representatives; lack of access to recreational or educational programs; and excessive phone charges have all been reported as "harsh realities" of ICE detention and major contributors to depression, stress and anxiety. *See, e.g.,*

13

ACLU of Massachusetts, *Detention and Deportation in the Age of ICE*, p. 8 (2008).

The plea agreement (Doc. 40, paragraph 8) provides that if the United States Attorney's office for the Northern District of Iowa is contacted by the Department of Justice regarding Boyachek's application to be transferred to Canada it will support the Defendant's transfer request. Even if Boyachek seeks such a transfer, the time for processing an international transfer application often exceeds nine months, and the average time between granting the application and the actual transfer was 76 days in the most recent survey. Correctional Service of Canada, *International Transfers 2013-2014 Annual Report*, http://www.csc-scc.gc.ca/international-transfers/004001-1003-eng.shtml.

These collateral immigration consequences – and the prospect of imprisonment beyond any term imposed by the court – warrant a downward variance. *See* United States v. Ferreria, 239 F.Supp.2d 849, 857-858 (E.D. Wis. 2002) (restrictions on Bureau of Prisons programing, eventual deportation justify downward departure); United States v. Loaiza-Sanchez, 622 F.3d. 939, 942 (8th Cir. 2010) (Bright, J., dissenting) (likelihood of deportation should be factored into necessity of lengthy imprisonment).

      D.   **Kind of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

The United States and Boyachek agree that the advisory guideline range is 46 to 57 months. In determining a sentence sufficient but not greater than necessary, the court must consider sentences imposed in similar cases for defendants with similar records. Likewise, the Defendant believes that the court should consider sentences imposed in the related cases identified by the presentence report, as well as sentences imposed on his co-conspirators. The following cases represent a summary of sentences imposed in related prosecutions:

- United States v. Jeffrey Kopp, Northern District of Iowa case number 6:07CR02012-1-MWB, sentenced to 60 months, concurrent, following pleas of guilty to conspiracy to deliver marijuana and money laundering;

- United States v. Michael Thomas Breneman, Northern District of Iowa case no. 6:07CR02012-2-MWB, sentenced to 25 months, concurrent, following pleas of guilty to conspiracy to deliver marijuana and money laundering;

- United States v. David Anthony Downing, Northern District of Iowa case no. 6:07CR02012-5-MWB, sentenced to 69 months, concurrent, following pleas of guilty to conspiracy to deliver marijuana and money laundering;

- United States v. Daniel Berger, Northern District of Iowa case no. 6:07CR02012-3-MWB, sentenced to time served (approximately five days) and sixty days of intermittent confinement on alternating weekends while on supervised release, following plea of guilty to conspiracy to deliver marijuana;

- United States v. Azar Niekamp, Northern District of Iowa case no. 6:07CR02012-4, sentenced to time served (approximately fourteen months) following plea of guilty to conspiracy to deliver marijuana;

- United States v. Juliana Steernberg, Central District of Illinois case no. 07-40054-001, sentenced to 33 months, later reduced to 19 months, following

plea of guilty to distribution of marijuana.

As demonstrated above, a long-term imprisonment would create an unwarranted disparity compared to sentences imposed on others in like cases.

E.     **Sentencing Recommendation**.

For all the reasons described above, Defendant Jason Boyachek respectfully requests that the court grant his motion for downward variance and impose a sentence of time served – one sufficient, but no greater than necessary, to satisfy the sentencing objectives applicable to this defendant in this case. Should the court impose an additional period of imprisonment, and given the factors described in this memorandum, counsel further requests that the court recommend to the Bureau of Prisons that the defendant be designated to a federal correctional institution in the northwest or northern United States, to facilitate opportunities for his family to visit him. In addition, the Defendant further requests that the court indicate that it has no objection to the Defendant obtaining a transfer of his custody to Canadian correctional authorities.

/s/ Leon F. Spies
LEON F. SPIES
PIN: AT0007456
Attorney for Defendant
312 E. College Street, Suite 216
Iowa City, Iowa 52240
Phone (319) 337-4193
Fax (319) 337-2396
spieslegal@aol.com

16

CERTIFICATE OF SERVICE
I certify that I electronically served/mailed a copy of the foregoing document to
which this certificate is attached to the parties or attorneys of record, shown below,
on  January 6, 2016

By:  /s/ Leon F. Spies                                                         .

Mr. Patrick Reinert  (electronically)
Assistant United States Attorney

Mr. Jason Boyachek  (U.S. Mail)